**Joel SMOLEN, et al., Plaintiffs–Appellants,**

v.

**DELOITTE, HASKINS & SELLS, Defendant–Appellee.**

No. 89–15648.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 4, 1990.

Decided Dec. 27, 1990.

---

5. Of course, we so held in *Price v. Akaka* and we independently so hold today.

Robert E. Dunne, Morgan, Ruby, Schofield, Franich & Fredkin, San Jose, Cal., for plaintiffs-appellants.

John M. Ottoboni, Ferrari, Alvarez, Olsen & Ottoboni, San Jose, Cal., for defendant-appellee.

Before NELSON and TROTT, Circuit Judges, and STEPHENS, District Judge.[*]

TROTT, Circuit Judge:

## SUMMARY

Joel Smolen and Dennis and Sandra McLaughlin appeal summary judgment dis-

---

[*] The Honorable Albert Lee Stephens, Jr., Senior U.S. District Judge, Central District of California, sitting by designation.

missing their action against Deloitte Haskins & Sells ("DH & S") for federal securities law violations, accounting malpractice, breach of fiduciary duty/constructive fraud, and negligent misrepresentation. We affirm.

### FACTS

In 1975, after working for several years in the precious metals extraction industry, Appellant Joel Smolen founded Applied Molecular Technology Corp. ("Amtec"), which extracts precious metals from scrap metal. Smolen owned 90 per cent of Amtec's stock and acted as its president until it was sold in July 1982. Appellant Dennis McLaughlin bought ten per cent of the stock from Smolen shortly after Amtec's founding.

To finance its operations, Amtec had a line of credit from Chase Manhattan Bank ("Bank"). The Bank required that Amtec submit regular "borrowing base" reports on the value of its scrap metal inventory, which was Amtec's principal asset and which secured the Bank loans. In preparing the "borrowing base" reports, Amtec's internal accounting staff estimated inventory value by using Amtec's material code standards, which apparently are approximate ounces of precious metals per ton of specific types of scrap and usually were established with Amtec's data on the historical yield of the scrap. Amtec's controller was Dan Mooney from April to August 1981, and Anita Faulkner from then until the company was sold.

Appellee DH & S, an accounting partnership, examined and expressed opinions on Amtec's financial statements for the fiscal years 1978 through 1982, all of which ended on May 31. This involved an annual audit of Amtec's inventory, required by the Bank to verify inventory value.

Amtec's 1981 financial statement, audited and certified by DH & S, valued scrap inventory at $10,027,000. On September 10, 1981, Mooney sent to Smolen, McLaughlin, and the Bank a memorandum stating that the recovery of precious metals from scrap was far lower than estimated in the 1981 audited financial statement. The memorandum began:

In reviewing the first quarter (June through Aug.) operations, it has become apparent the inventory of PC board [a source of scrap] was overstated at May 31, 1981 by a significant amount.

Mooney estimated that the overstatement was potentially as much as 10,000 to 18,000 ounces of gold, i.e., at the 1981 gold price of about $465 per ounce, 4.6 to 7.2 million dollars. As a result, Smolen demanded that DH & S investigate the accuracy of their 1981 inventory calculations, asking whether Mooney's analysis was correct or whether DH & S's inventory calculations were verifiably accurate.

Appellants contend that, before Amtec's subsequent sale, Mr. Madigan of DH & S performed two studies of the 1981 inventory figures and reported on them in field notes expressing concern with the figures. He noted that Mooney's analysis did not disprove the 1981 figures, and estimated that 1981 inventory was overstated by 5.1 million dollars. Appellants contend further that DH & S failed to disclose the studies to them. DH & S contends that Mr. Madigan in his work papers merely calculated that, if Mooney were correct, the 1981 audit could overvalue inventory by five million dollars and noted that further assays might be needed, but reached no conclusions and issued no reports before the sale.

In April 1982, appellants and third-party buyer Amaco Enterprises, Inc. ("Amaco") signed a letter of intent providing for sale of all Amtec stock. The letter of intent contemplated that the sale price would be six million dollars, the sale would close after DH & S had completed its 1982 audit, and appellants would warrant the 1979 through 1982 audits and "March 31, 1982 interim [presumably internally prepared, unaudited] financials." At the outset of the negotiations, appellants advised DH & S that they would rely on the audited 1981 financial statement and unaudited 1982 financial statement in the transaction.

The closing occurred on July 21 or 22, 1982, about one year before DH & S released its 1982 audit opinion. On DH & S's advice, appellants did not warrant the 1981

financial statement. Apparently appellants also did not warrant 1982 figures. Section 1.6 of the Stock Purchase Agreement established the sale price of $5,250,000 based on an unaudited balance sheet entitled Schedule J, and provided for dollar-for-dollar adjustment of the price to the extent that the inventory value reported in Schedule J differed from actual inventory value reported in the 1982 audit opinion.

A critical dispute exists with respect to the extent to which Schedule J incorporates 1981 and 1982 inventory figures provided and/or verified by DH & S. Appellants contend that Faulkner, who prepared Schedule J, based inventory figures in it on information provided and/or verified by DH & S. For support, appellants point to the declarations of (1) Faulkner, who alleged she obtained inventory figures from and verified figures with DH & S, and (2) Smolen and the buyers, who alleged their understanding that Faulkner obtained such information from appellee. DH & S contends it neither provided 1982 inventory figures nor verified inventory figures to Faulkner.

In her deposition, Faulkner testified she adjusted inventory figures in Schedule J downward in accordance with discussions with DH & S's employees who were conducting the 1982 audit. In response to a question as to whether the basis for Schedule J was one of the interim financial statements she regularly prepared, she testified: "The AMTEC general ledger, then the inventory I had available at that date, yes." She mentioned that, in preparing each interim financial statement, she gathered information and "verif[ied] it against independent confirmations."

In his deposition, Harvey Armstrong of Amaco testified that although he had not seen a draft of DH & S's 1982 figures, Terry Gibson of DH & S assured him on the date of the closing that the 1982 audit was completed, and that he subsequently received a draft of the 1982 audit. He testified further that it was his understanding that Faulkner obtained the figures used in Schedule J from DH & S.

Richard Cook of Amaco testified as to a phone conversation he and Armstrong had with Gibson shortly before closing:

We told him [Gibson] that ... we were getting ready to close ... and wanted his assurance that the field work was finished; that the inventory adjustments were all booked or known—information known, because he had been working with—he had been in touch with Anita [Faulkner] during the day providing the information for Schedule J and we were calling independent of those conversations, to confirm that the adjustments were all in ...

Smolen testified that shortly before the closing Gibson had told him that DH & S had completed its "work" and there would be no changes in the final numbers, and that it was his understanding that DH & S gave this unaudited information to Faulkner before the closing.

Thus, appellants contend Gibson, as the appellees' representative, gave assurances to Smolen shortly before the closing date that DH & S had completed its 1982 audit work and that the figures used by Faulkner were accurate.

Additionally, appellants allege that a draft 1982 audit report completed by DH & S around the time of the closing valued inventory at $8,236,000, while Schedule J valued inventory at $8,477,205. DH & S claims no such draft existed at that time.

In September and November 1982, DH & S decertified its 1981 opinion based on overstatement of inventory value by 4.7 million dollars, restating inventory from $10,027,000 to $5,328,000 as of May 31, 1981. Allegedly as a result, Amaco discontinued payments to appellants on the promissory notes.

## THE LAWSUIT

On August 19, 1983, appellants sued DH & S for violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, and section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), as well as professional negligence/accounting mal-

practice, breach of fiduciary duty/constructive fraud, and negligent misrepresentation and suppression of facts. They allege they relied on the 1981 audited financial statement (in particular on DH & S's failure to disclose the full magnitude of the potential $5,000,000 inventory overvaluation noted in Madigan's field notes) and the 1982 unaudited financial data (allegedly incorporated into Schedule J) in deciding to sell Amtec and in agreeing to the terms of sale. They allege that, as a result of this reliance, they sold Amtec under terms yielding unacceptably low proceeds because the 4.7 million dollar inventory adjustment reduced the sales price from $5,250,000 to $550,000.

## PROCEEDINGS IN THE TRIAL COURT

On April 14, 1989, the district court granted summary judgment for DH & S on the ground that no reasonable juror could find appellants sold Amtec in reliance upon any misrepresentations made by DH & S. The court stated in a written opinion that "Schedule J was prepared using data obtained from an interim financial statement prepared by Amtec's own accounting department and not yet approved by DHS." The opinion further stated that DH & S's "misrepresentations allegedly come from two sources, separate audit reports on Amtec's 1981 and 1982 financial statements."

## STANDARD OF REVIEW

This court reviews de novo a grant of summary judgment. *Kruso v. Int'l Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). A court shall grant summary judgment if the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This court must determine whether, viewing the evidence in the light most favorable to the appellants, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Tzung v. State Farm Fire & Casual-*

*ty Co.*, 873 F.2d 1338, 1339–40 (9th Cir. 1989).

▮ To show existence of a "genuine" issue, appellants must present some evidence establishing each element of their claims on which they would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). They "must produce at least some 'significant probative evidence tending to support the complaint.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

## DISCUSSION

A. Whether issues of material fact remain.

Appellants contend issues of material fact remain as to whether: (1) Faulkner based inventory figures stated in Schedule J on information supplied by DH & S; (2) appellants relied on DH & S's verification of inventory figures in Schedule J (allegedly conveyed by DH & S's draft 1982 audit report and assurances to Smolen that the final 1982 audit would not differ significantly from the draft report); (3) Smolen relied on the audited 1981 financial statement; and (4) DH & S's nondisclosure of Madigan's field notes showing a potential five million dollar overvaluation of the 1981 inventory constituted nondisclosure of a material fact.

The substantive law governing each claim at issue determines the materiality of a fact. *T.W. Elec. Serv.*, 809 F.2d at 630.

▮ To succeed on a claim based on material misrepresentations under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, a plaintiff must show reliance upon the misrepresentations in entering into the transaction that caused the harm. *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). To succeed on a 10b–5 claim based

upon a material nondisclosure, "a plaintiff need not show reliance ... but must still show that the facts concealed were material 'in the sense that a reasonable investigator might have considered them important' " in making the investment decision. *Id.* at 380–81 (quoting *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972)); *see also SEC v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982) (for purposes of section 10(b), section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), and fraudulent misrepresentation claims, a fact is material if a reasonable person would attach importance to it in determining choice of action).

■ Appellants must present some evidence establishing the element of causation, in the sense of actual and justifiable reliance upon misrepresentations or omissions of material fact, to avoid summary judgment on their professional negligence, constructive fraud, and negligent misrepresentation claims. *See Stagen v. Stewart–West Coast Title Co.,* 149 Cal.App.3d 114, 119–20, 196 Cal.Rptr. 732 (1983) (negligence of professional supplier of business information requires that plaintiff justifiably rely on information); *Vai v. Bank of America Nat'l Trust & Sav. Ass'n,* 56 Cal.2d 329, 15 Cal.Rptr. 71, 364 P.2d 247 (1961) (reliance implicitly required in constructive fraud case arising from breach of fiduciary duty), *overruled in part on other grounds, In re Marriage of Connolly,* 23 Cal.3d 590, 153 Cal.Rptr. 423, 591 P.2d 911 (1979); *Cortez v. Weymouth,* 235 Cal. App.2d 140, 45 Cal.Rptr. 63, 69 (1965) (fraudulent misrepresentation requires justifiable and actual reliance upon representation of material fact); *Restatement (Second) of Torts* § 552 (negligent misrepresentation requires actual and justifiable reliance).

Appellants have not met their burden under *T.W. Electrical* of presenting significant probative evidence as to the first three issues above.

As to appellants' first issue, Faulkner testified in her deposition that she prepared Schedule J from internally-generated interim financial statements and the Amtec general ledger. Her statement that she adjusted inventory figures in Schedule J downward in accordance with discussions with DH & S is too vague to create a genuine issue as to whether she used information supplied by appellee in preparing Schedule J. Moreover, this statement appears to have been both undeveloped in her deposition and insignificant as compared to other specific evidence (underscored by the district court) to the effect that Schedule J was prepared using data from Amtec's own accounting department. Nor does the similarity of the inventory figures in Schedule J and in the 1982 audit create a genuine issue. The declarations of Smolen, Armstrong, and Cook regarding their understanding that Faulkner consulted with DH & S in preparing Schedule J are irrelevant because they are not based on personal knowledge of the alleged communications between Faulkner and DH & S or of her alleged reliance on DH & S. Further, even if DH & S did supply some information for and/or verification of Schedule J, appellants were not entitled to rely on such informal verbal comments as those they claim were made. Finally, the fact that the Stock Purchase Agreement provided for adjustment of the sale price in accordance with the 1982 audit inventory figures shows appellants did not actually rely on any 1982 information allegedly provided by DH & S to Faulkner before the closing.

As to the second issue presented by the appellants, no evidence shows that DH & S had prepared a draft 1982 audit report before the sale. In fact, appellant Armstrong testified in his deposition, in direct contradiction to appellants' contention, that he had not seen such a draft prior to the closing. The evidence indicates DH & S did not issue a draft until after the closing and did not issue the final 1982 audit until July 1983, about one year after the closing, and that appellants never saw a draft before the closing.

As to appellants' third issue, no genuine issue of material fact exists as to whether appellants relied on the 1981 audit figures. Extensive evidence—including Smolen's re-

fusal to warrant the 1981 figures and reduction of inventory figures following Mooney's memorandum, and provision in the Stock Purchase Agreement for adjustment of the stock price in accordance with the eventual 1982 audit figures—establishes that Smolen did not actually rely on the 1981 figures. Further, Mooney's memorandum, which estimated the overstatement of gold in pc board inventory at between 10,000 and 18,000 troy ounces (i.e., a $4.2– to $10–million overstatement in inventory), and DH & S's advice that appellants not warrant the 1981 inventory figures gave appellants sufficient notice that 1981 figures vastly overstated inventory and thus made any reliance by appellants unreasonable.

As to appellants' fourth issue, no genuine issue of material fact exists as to whether DH & S's nondisclosure of Madigan's field notes showing a potential five million dollar overvaluation in 1981 constitutes nondisclosure of a material fact. Since Smolen and McLaughlin received Mooney's memorandum asserting a potential overvaluation of a similar magnitude, appellants could not reasonably have attached importance to Madigan's field notes in deciding on their action in the sale transaction. Therefore, the statements in the field notes were not material. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

■ In granting summary judgment on appellants' section 12(2) claim, the district court incorrectly held that the claim failed for lack of evidence of appellants' reliance on DH & S's alleged misrepresentations. In fact, reliance is not an element of a section 12(2) claim. *Ellis v. Carter,* 291 F.2d 270, 272 (9th Cir.1961); *see also MidAmerica Federal Savings & Loan Ass'n v. Shearson/American Express,* 886 F.2d 1249, 1256 (10th Cir.1989); *Currie v. Cayman Resources Corp.,* 835 F.2d 780, 782 (11th Cir.1988); *Barnes v. Resource Royalties, Inc.,* 795 F.2d 1359, 1366 n. 9 (8th Cir.1986), *cert. denied,* —— U.S. ——, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990) (although reliance not required under sec-

tion 12(2), some causal connection required); *Davis v. Avco Financial Servs., Inc.,* 739 F.2d 1057, 1068 (6th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 381 (1985); *Junker v. Crory,* 650 F.2d 1349, 1359 (5th Cir.1981); *Sanders v. John Nuveen & Co.,* 619 F.2d 1222, 1225 (7th Cir.1980); *The Johns Hopkins University v. Hutton,* 488 F.2d 912, 914 (4th Cir.1973), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 1623, 40 L.Ed.2d 118 (1974); *but cf. Wilson v. Ruffa & Hanover, P.C.,* 844 F.2d 81, 86 (2d Cir.1988) (section 12(2) action against "nonselling collateral participants" such as law firm that prepared private-placement memorandum at issue requires proof of reliance, even though action against the actual seller does not).

■ Nevertheless, we affirm summary judgment as to section 12(2) count on the ground that, as DH & S urges, appellants were neither purchasers nor offerees of the stock sold and hence lacked standing under section 12(2). *See Bosse v. Crowell Collier & MacMillan,* 565 F.2d 602, 610 (9th Cir. 1977) (plaintiffs-former stockholders lacked standing under section 12(2) to sue defendant lender, which had bought plaintiffs' stock at foreclosure, because plaintiffs were neither purchasers nor offerees); 15 U.S.C. § 77*l*.

B. Whether the district court erred in determining that reliance upon misrepresentations was a necessary element of appellants' professional negligence claim.

■ Appellants' contention that the district court applied an incorrect interpretation of professional negligence by construing it to require misrepresentation by DH & S is meritless. In fact, the district court correctly required evidence of a causal connection between DH & S's breach of duty, in this case allegedly negligent rendering of accounting services and misrepresenting and omitting material facts, and the claimed injury, pecuniary losses from sale of Amtec. As noted above, a plaintiff's reliance on a professional's misrepresentations is an element of professional negligence of the variety alleged here. *See*

*Stagen,* 149 Cal.App.3d at 119–20, 196 Cal. Rptr. 732.

Accordingly, summary judgment for DH & S is

AFFIRMED.