**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT P. MOSIER, as Receiver for Private Equity Management Group Inc. and Private Equity Management Group, LLC and their subsidiaries and affiliates, <br> *Plaintiff-Appellant*, <br><br> v. <br><br> STONEFIELD JOSEPHSON, INC., CPAs, a California corporation, <br> *Defendant-Appellee*. | No. 13-56453 <br><br> D.C. No. 2:11-cv-02666-PSG-E <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted
October 23, 2015—Pasadena, California

Filed February 23, 2016

Before: Harry Pregerson and Stephen S. Trott, Circuit
Judges and William H. Stafford,* Senior District Judge.

Opinion by Judge Trott

---

* The Honorable William H. Stafford, Jr., Senior District Judge for the
U.S. District Court for the Northern District of Florida, sitting by
designation.

## SUMMARY[**]

### California Tort Law

The panel affirmed the district court's summary judgment in favor of accountants on tort claims brought by a court appointed receiver against the accountants who audited the financial statements for fraudulent offerings of the companies for which the receiver was appointed.

The panel affirmed the district court's grant of summary judgment on the receiver's claims for professional negligence and aiding and abetting the wrongful conversion of the companies' assets under California law. The panel held that the receiver did not raise a genuine issue as to causation because he did not show that either the companies or its investors relied on the audits. The panel also affirmed the district court's grant of summary judgment on a claim of unjust enrichment.

### COUNSEL

Randall A. Smith (argued), Ronald Rus, Sara A. Milroy, and Laurel R. Zaeske, Brown Rudnick LLP, Irvine, California, for Plaintiff-Appellant.

Stephen J. Tully (argued) and Efren A. Compeán, Garrett & Tully, P.C., Westlake Village, California, for Defendant-Appellee.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Michael C. Kelley, Bradley H. Ellis, Mark E. Haddad, and Collin P. Wedel, Sidley Austin LLP, Los Angeles, California, for Amici Curiae California Society of Certified Public Accountants and American Institute of Certified Public Accountants.

**OPINION**

TROTT, Senior Circuit Judge:

Appellant Robert Mosier is the court appointed receiver for Private Equity Management Group, Inc. and its interrelated subsidiaries and affiliates (collectively, "PEMGroup"). Mosier was appointed after the former directors and mangers of PEMGroup used the companies to defraud investors of approximately $950 million in what the district court called a "massive Ponzi scheme."

Mosier sued Appellee Stonefield Josephson, Inc., the CPAs who audited the financial statements for six of PEMGroup's fraudulent offerings. Mosier contends that Stonefield's reports and related conduct materially misrepresented PEMGroup's financial condition, allowing PEMGroup's management to prolong the life of their scheme and to loot and to dissipate assets from PEMGroup. According to Mosier, if Stonefield had performed its audits competently or simply resigned after it caught wind of management's fraud, PEMGroup could not have attracted new investors. Mosier seeks $51 million from Stonefield in compensation for damages the firm allegedly caused to PEMGroup.

Mosier's first amended complaint stated three causes of action: 1) professional negligence, 2) aiding and abetting the wrongful conversion of PEMGroup's assets, and 3) unjust enrichment. On summary judgment challenging all three claims, the district court dismissed the first two, holding that Mosier had not raised a genuine issue as to the existence of an essential aspect of his case: proof of causation. Specifically, the district court held that to show causation, Mosier ultimately would have to demonstrate that either PEMGroup or its investors relied on Stonefield's audits, but that Mosier had utterly failed to satisfy this legal requirement. Moreover, the court concluded that any reliance on the audits by the investors would have been unreasonable. As to claim three for unjust enrichment, the court also granted summary judgment. Although Stonefield challenged this cause of action in its motion, Mosier did not respond to or defend it in his response.

We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm.

# I

## BACKGROUND

Danny Pang founded PEMGroup. Together with PEMGroup's directors and management, Pang established Genesis Voyager Equity Corporation ("GVEC") and its related entities GVEC II and GVEC IV as subsidiaries of PEMGroup. These entities, known as "special purpose vehicles," eventually became parts of an integrated swindle.

GVEC made debt and equity offerings in life insurance policies and commercial real estate mortgages. These

offerings allegedly raised $951 million. In its offering memoranda, GVEC told investors to expect a return on their investments of between approximately six to seven percent. However, eventually the "returns" GVEC paid did not come from its investments. GVEC fraudulently paid its investors with money from new investors and by selling GVEC's assets to GVEC II and GVEC IV at over-inflated prices. In addition to paying old investors with new investor money, management used the ill-gotten money from unsuspecting investors to prop up GVEC by paying GVEC's overhead and retiring older offerings. Management also looted money from PEMGroup for their own personal benefit.

In 2003, GVEC hired Stonefield to audit the financial statements for six of its offerings. Stonefield issued ten audit reports for fiscal years 2003 through 2007. Mosier alleged that these reports fell below Generally Accepted Auditing Standards ("GAAS") in a variety of ways. However, Stonefield's cardinal sin in Mosier's eyes was Stonefield's alleged failure sufficiently to warn investors that GVEC's management had not accurately reported the value of its assets in accordance with Generally Accepted Accounting Principles ("GAAP"). Mosier estimates that GVEC misstated the value of eighty to ninety percent of the assets in the financial statements.

Beginning with its March 2004 report, a wary Stonefield issued "qualified" opinions about their client's operations. "A qualified opinion states that, except for the effects of the matter(s) to which the qualification relates, the financial statements present fairly, in all material respects, the financial

position, results of operations, and cash flows of the entity in conformity with generally accepted accounting principles."[1]

Extending through the end of Stonefield's relationship with PEMGroup, each of Stonefield's audit reports expressed significant reservations about its client's improper method of assigning value to its assets and the unknown effects of those questionable practices on its financial statements. For example, Stonefield's "Independent Auditors' Report" dated March 4, 2005 says,

> [T]he Company has valued certain investments ("Growth Special Assets") at a method similar to an amortized cost basis, which basis values the investment at historical cost. Any potential unrealized gain resulting from these Growth Special Assets is then amortized on a straight-line basis over their estimated life. In our opinion, accounting principles generally accepted in the United States of America require that all investments be presented at fair value, and all corresponding changes in fair value between balance sheet dates be recorded to the statement of operations. The Company has elected to not disclose the exact nature of all of the special assets for confidentiality purposes, which is also a departure from accounting principles generally accepted in the United States of America. The effects on

---

[1] *Reports on Audited Financial Statements*, AU § 508.10, *available at* http://www.aicpa.org/Research/Standards/AuditAttest/DownloadableDocuments/AU-00508.pdf.

the financial statements of the preceding practice is not reasonably determinable.

In a summary note to Stonefield's report, the misgivings continued:

> The Company is recognizing unrealized gain resulting from the Growth Special Assets . . . on a straight-line basis method over the estimated life of the Growth Special Assets, which method is not in accordance with accounting principles generally accepted in the United States of America ("US GAAP"). US GAAP requires that all investments be presented at fair value, and all corresponding changes in fair value between balance sheet dates be recorded to the statement of operations. The effects on the financial statements of this non US GAAP practice are not reasonably determinable.

In a letter dated April 18, 2008 addressed to "Board of Directors and Inventors Genesis Voyager Equity Corporation," Stonefield warned that GVEC's

> [r]ecording of the sale of Special Assets were not in accordance with accounting principles generally accepted in the United States of America. The Special Assets of the Portfolio were sold to an affiliated entity that shares the same advisor as [GVEC]. Furthermore the valuation for the sale price of the Special Assets could not be concluded to be Fair

Market Value independently of management's internal valuation.

In Mosier's opinion, however, Stonefield's series of qualified reports did not go far enough. Given the extent to which GVEC admittedly misstated asset values, Mosier alleges that Stonefield should have issued either an adverse opinion or refused to issue any opinion at all and simultaneously to unload GVEC as a client. "An adverse opinion states that the financial statements do not present fairly the financial position, results of operations, or cash flows of the entity in conformity with generally accepted accounting principles." AU § 508.10, *supra*.

Stonefield's involvement with GVEC and PEMGroup went beyond issuing qualified audit reports. Stonefield attended a meeting with at least one investor, although the record does not reveal what Stonefield said during the meeting. Also, Stonefield authored "comfort letters," which stated that its qualified audit reports were prepared in accordance with GAAS and fairly described the "quality or reliability of the [relevant] financial statements." Two of Stonefield's auditors served as a character reference for Danny Pang and another of PEMGroup's managers. Finally, Stonefield prepared for GVEC's board of directors and investors net asset valuations and limited reports concerning two of the sales between GVEC and its affiliates.

Stonefield never had an entirely comfortable relationship with GVEC. Early on, Stonefield learned that its predecessor had resigned as GVEC's CPA after GVEC misrepresented the predecessor's involvement with GVEC's initial funding period. Furthermore, the manner in which PEMGroup structured GVEC and its offerings – e.g, soliciting only

Chinese investors, basing its operations in the British Virgin Islands, and promising seemingly unsustainable rates of return – raised Stonefield's concerns. As time went on, Stonefield began seriously to question GVEC's operations, management's integrity and competence, and whether Stonefield should resign. Ultimately, Stonefield did resign, but not until April 29, 2009, after it learned that the SEC had filed a complaint against Pang and PEMGroup, and that the FBI had arrested Pang.

## II

## DISCUSSION

### 1. On whose behalf may Mosier sue Stonefield?

To understand this controversy, some focus is useful.

At the early stages of the litigation, Stonefield moved to dismiss Mosier's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that Mosier lacked standing to sue on behalf of the defrauded investors. The court concluded that Mosier had standing to sue Stonefield, but not to do so on behalf of the investors. The court explained its analysis and ruling as follows:

> In general, a receiver has capacity to bring only such actions as could have been brought by the entity or individual whose property is in a receivership, and thus may sue only to redress injuries to the entity in receivership. *Grant v. A.B. Leach & Co.*, 280 U.S. 351, 50 S.Ct. 107, 74 L.Ed 470 (1930); *see also Scholes v. Lehmann*, 56 F.3d 750, 753 (7th

Cir. 1995). In contrast, equity receiver or trustee of an entity cannot pursue claims where the alleged harm was suffered only by third-party investors in that entity. *See Williams v. California 1st Bank*, 859 F.2d 664, 666 (9th Cir. 1988); *cf. Hays v. Adam*, 512 F. Supp. 2d 1330, 1341 (N.D. Ga. 2007) (noting that third party investors may nonetheless indirectly benefit from the receiver's action as creditors of the receivership). As the Ninth Circuit has noted, "[a]lthough the line between 'claims of the debtor, which a trustee [or equity receiver] has statutory authority to assert, and 'claims of creditors,' which [*Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972)] bars the trustee from pursuing, is not always clear, the focus of the inquiry is on whether the Trustee is seeking to redress injuries to the debtor itself caused by the defendants' alleged conduct." *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir. 2005).

Here, upon reviewing the FAC, the Court finds that the allegations show that, in bringing this action, the Receiver seeks to redress injuries caused to PEMGroup and its affiliate entities by Stonefield's alleged misconduct. The Receiver, for example, has alleged that Stonefield owed, and breached, a contractual duty of care to PEMGroup and GVEC to conduct and audit of the company's financial statements using the appropriate

industry standards. *FAC* ¶¶ 30–32, 43–47. He goes on to assert that Stonefield's breach of this duty allowed the PEMGroup Principals to dissipate GVEC's assets through transfers to other Tranches when GVEC was unable to pay its operating expenses, which ultimately led to the "retirement" of GVEC portfolios once those portfolios had been looted of their assets. *FAC* ¶¶ 25–26, 35. Further, according to the pleading, "[h]ad the misuse of funds been revealed earlier, Pang and the PEMGroup Management Team would have been stopped and investigated, preventing millions of dollars of additional losses." *FAC* ¶ 35.

While certain allegations in the FAC could conceivably be said to allege injury to investors as well, this does not necessarily vitiate the Receiver's standing to pursue claims on behalf of the receivership entities. Rather, as the Ninth Circuit has acknowledged, so long as an entity in receivership has suffered harm, an equity receiver has standing to pursue a claim for such injuries – even if the creditors of the receivership entity may also have a claim arising from the same underlying misconduct. *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002–04 (9th Cir. 2005) (noting that the "dissipation of assets limited the firm's ability to repay its debts . . . is not, however, a concession that only the creditors, and not [the corporate entity] itself, have sustained any

injury. [I]t is a recognition of the economic reality that any injury to an insolvent firm is necessarily felt by its creditors."). . . .

Here, similarly, the Receiver has alleged that Stonefield's failures to (1) conduct rigorous audits in accordance with GAAS standards, *FAC* ¶ 35; (2) to make disclosures regarding, *inter alia*, allegedly improper inter-Tranche transfers, *FAC* ¶¶ 32, 46; and (3) Stonefield's allegedly false and misleading audit reports were all significant factors in concealing Pang and PEMGroup Principals' misuse of investor funds. *FAC*. ¶ 35. According to the pleading, had the misuse of funds been revealed earlier, additional losses would have not been incurred. *Id.* The Court finds that, as in *Smith*, these allegations qualify as a corporate injury traceable to Stonefield's conduct for which the Receiver is authorized to seek recovery. Additionally, while Stonefield contends that PEMGroup's use of funds from later Tranches to purchase life insurance policies from earlier GVEC Tranches at inflated prices actually *benefitted* GVEC in that it "served to maintain the illusion of the financial and operational strength of PEMGroup," *Reply* 1:13–16, evaluation of this assertion requires the Court to look beyond the pleadings. At this stage in the proceedings, however, the Court must take as true the Receiver's allegations that the PEMGroup and GVEC entities were harmed by, *inter alia*, their inability to repay various

note and debenture holders as a result of Stonefield's alleged misconduct. See *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

The consequences of the district court's Rule 12(b)(6) holding on standing, which Mosier does not challenge on appeal, is that his lawsuit requires a viable cause of action not on behalf of the investors, but on behalf of PEMGroup.

Accordingly, there are two avenues Mosier as a receiver might pursue against Stonefield on behalf of the derelict PEMGroup. The first is a professional negligence claim, i.e., that Stonefield provided PEMGroup with substandard and misleading audit reports which wrongly enabled PEMGroup to continue to exist as it plundered its own assets. This path alleged a breach by Stonefield of its contractual duty to PEMGroup. The second avenue is an aiding and abetting claim, i.e., that Stonefield created substandard and misleading audit reports which caused investors to continue to pour money into PEMGroup, and which (1) kept it alive, (2) facilitated its illicit fundraising activities, (3) pumped up the enterprise, (4) gave it a badge of legitimacy, and (5) brought in millions of dollars which Danny Pang and associates then stole.

## 2. Reasonable reliance is a necessary component of Mosier's professional negligence and aiding and abetting claims.

No matter which avenue Mosier pursues, his professional negligence as well as his aiding and abetting claims require Mosier to prove that Stonefield's tortious conduct was a proximate cause of PEMGroup's harm. *See Williams v.*

*Wraxall*, 33 Cal.App.4th 120, 132 (1995) ("Causation [in a professional negligence claim] requires proof that the defendant's conduct was a '*substantial factor*' in bringing about the harm to the plaintiff." (emphasis added)); *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1135 (C.D. Cal. 2003) ("[C]ausation is an essential element of an aiding and abetting claim, i.e., plaintiff must show that the aider and abettor provided assistance that was a *substantial factor* in causing the harm suffered." (emphasis added)) cited with approval in *American Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1476 (2014).

Given Mosier's case, in order to prove *causation* he must ultimately prove reasonable reliance, even though reliance per se is not a technical element of his causes of action. Stonefield's work could not have been a "substantial factor" *or* given "substantial assistance" to PEMGroup in soliciting new investors unless the potential investors relied on Stonefield's reports. The district court therefore properly concluded that to survive summary judgment, Mosier would have to offer substantial evidence – meaning sufficient evidence to justify a verdict in his favor – that investors reasonably relied on Stonefield's audits in order to show causation. The cases the district court cited support that conclusion. *See Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 964 (9th Cir. 1990); *see also In re NM Holdings Co., LLC*, 622 F.3d 613, 619 (6th Cir. 2010) ("Although Gold is correct in pointing out that reliance is not per se an *element* of professional negligence, *proof* of reliance is necessary here in order to show that Deloitte's allegedly deficient audits were the cause in fact of Venture's tenuous financial position and resulting bankruptcy." (emphasis added)); *F.D.I.C. v. Ernst & Young*, 967 F.2d 166, 170 (5th

Cir. 1992) ("If nobody relied upon the audit, then the audit could not have been a substantial factor in bringing about the injury." (internal quotation marks omitted)).

Mosier disagrees that proof of reasonable reliance is necessary in order to show causation, relying on *Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005). There, the bankruptcy trustee alleged that the debtor's auditors committed professional malpractice by concealing the debtor's deepening insolvency from its outside directors and investors. *Id.* at 1003. The auditor's concealment thereby artificially prolonged the life of the debtor corporation, wasting corporate assets that could have otherwise gone to its creditors in the process. *Id.* at 1003. *Smith* held that the bankruptcy trustee's "deepening insolvency" theory stated an injury-in-fact sufficient to give the trustee standing. *Id.* But standing was the *only* issue we decided in that case. We explicitly declined to say anything about the merits of the lawsuit, not even whether the complaint stated a valid claim for relief. *Id.* at 1006. *Smith* is of no help to Mosier.

### 3. Avenue #1, for a contractual breach of duty to PEMGroup.

As the district court correctly held,

> As participants in the fraud, GVEC and PEMGroup "cannot have relied on the truth of the fraudulent representations" in the audits. *See Cenco Inc. v. Seadman & Seidman*, 686 F.2d 449, 454 (7th Cir. 1982). In other words, "[b]ecause [GVEC and PEMGroup] knew of and participated in the fraud, [they] could not have justifiably relied on

[Defendant's] audits to uncover a fraud of which it already was aware." *See Agribiotech*, 2005 WL 4122738, at \*12; *see also PNC Bank, Ky.*, 899 F. Supp. at 1406 ("[I]t is clear that HMC as an institution did not rely upon the audits conducted by Grant Thornton in any manner in shaping its conduct, since it was aware, through the knowledge of its owners and top officers, of fraudulent conduct affecting the accuracy of the financial statements."). In sum, "the uncontested facts show fraud permeating the top management of [GVEC and PEMGroup]. In such a case the corporation should not be allowed to shift the entire responsibility for the fraud to its auditors." *Cenco*, 686 F.2d at 456.

The Receiver's other arguments regarding causation all miss the point. The Receiver appears to believe the Defendant is seeking to assert an *in peri delicto* defense or attempting to impute knowledge from PEMGroup to the Receiver. *Opp.* 18:4–20:2. While the Receiver is correct that this Court has already rejected the notion that any wrongdoing or knowledge may be imputed from PEMGroup to the Receiver, this conclusion is irrelevant to the present motion. Defendant does not now seek to impute knowledge from PEMGroup to the Receiver . . . .

This correct analysis disposes of Avenue #1.

### 4. Avenue #2, for reliance by the investors.

Before the district court and at oral argument, Mosier admitted he did not submit direct evidence that investors relied on Stonefield's audit reports or how PEMGroup used them. During oral argument on the motion for summary judgment, the district court asked, "Is there any evidence that one investor was provided with the audit report?" Mosier's attorney answer was, "[T]he answer to that specific question is no, your Honor, but the evidence does show [circumstantial evidence of investor reliance]."

This void becomes all the more problematic considering what Mosier said on May 15, 2013 in his deposition regarding potential investor witnesses, a deposition that took place almost two months before the hearing on the motion for summary judgment:

> Q (Counsel for Stonefield) Well, you are telling me that certain investors have told you they relied upon Stonefield's audit reports for GVEC tranches to do something, and I just want to know specifically?
>
> A (Robert Mosier) Let me draw a picture for you. I'm having a meeting with the investors and they are all sitting around this table talking about what induced them to come to PEM. And one investor said, I relied on the audit report. And the other investors agreed with him, yes, that's correct. We all relied on the audit reports.

Q And which investor, what individual at the investors, representative of the investor said that?

A I would have to go back and tell you who were at the meetings.

Mosier concedes he made a deliberate decision to oppose summary judgment without direct evidence of reliance by investors because he believed the circumstantial evidence of reliance and causation was sufficient. When the issue arose in district court, the court excluded his information of alleged reliance as hearsay, and correctly so. Mosier agrees with and does not challenge that ruling on appeal.

We find it difficult on this record to swallow the idea that PEMGroup showed Stonefield's qualified audits to investors in Taiwan. Mosier would have us believe that numerous Taiwanese investors lost millions to this fraud, yet he has not produced a single victim willing to step forward to help in a process that could indirectly recoup his or her losses. Were the audits translated into their language? Do they read English? In his deposition, Mosier testified that he had a meeting with defrauded investors to discuss what "induced them to come" to PEMGroup. Mosier said – and this was excluded hearsay – that the investors said, "We all relied on the audit reports." Did Mosier ask the investors for any paperwork corroborating their assertion? At least one of them might have had paperwork and files to scaffold their alleged statements and Mosier's assertions. Did he ask them for it? It's axiomatic that when stronger evidence of a fact is available, weaker evidence becomes even more so. If Conan Doyle had authored this scenario, he could have called it "The Case of the Missing Link."

Mosier argues in the alternative that there is "strong" circumstantial evidence of investor reliance. He points to (1) GVEC's offering memoranda, which stated that Stonefield was the auditor; (2) emails between Stonefield's accountants questioning GVEC's integrity; (3) the "comfort" letters; (4) GVEC's request for a statement explaining the impact of a qualified opinion; (5) and a May 23, 2006 "To Whom It May Concern" letter in which Stonefield stated that GVEC's "financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of each of the six projects."

The fatal problem for Mosier is that he has no evidence whatsoever demonstrating how these materials were used and, given Stonefield's qualifications, what weight, if any, investors placed on them. Instead, he asks us to draw the inference from his circumstantial evidence that indeed investors did rely on them. This equivocal evidence does not warrant such an inference. First, because of the clear qualifications in Stonefield's audit reports, which amount to red flags, it is just as likely – without any evidence to the contrary – that PEMGroup did *not* show them to people it was attempting to deceive. It defies logic to assume that a crook would waive cautionary "buyer-beware" alerts in front of potential innocent victims of a Ponzi scheme. Stonefield's qualifications previously quoted amount to a warning that PEMGroup was using improper and unreliable valuation methods, methods that violated GAAP; and that PEMGroup's financial statements might not be reliable.

In *United States v. Arthur Young*, 465 U.S. 805, 818 n.14 (1984), the Supreme Court said,

> The inclusion in an audited financial statement of anything less than an unqualified opinion [, such as a qualified opinion,] could send signals to stockholders, creditors, potential investors, and others that the independent auditor has been unable to give the corporation a clean bill of financial health.

In this regard, we agree with the district court that "[in] light of the statements in the audits regarding [GAAP] violations, it would not have been reasonable to rely on the audits to accurately reflect GVEC's financial condition . . . ."

Mosier has yet another problem. With the exception of the ill-advised glowing May 23, 2006 letter signed by Rick Poole, none of the materials provides an opinion on GVEC's financial statements. Instead, the materials either say nothing about the financials, or they direct the reader to the qualified audits. The "comfort" letters repeated the qualifications. The May 23, 2006 letter does provide an opinion on GVEC's financials, but, again, the record is devoid of any substantial evidence that investors relied on it.

Mosier also relies on (1) an agenda from an investor meeting that allotted time for Stonefield; (2) Poole's character references for Pang and another manager; (3) the net asset valuations, (4) the limited reports regarding the sales of GVEC's assets, and (5) the turncoat deposition testimony of Wilbur Quon, the CFO of PEMGroup, that "Stonefield audit reports were "[t]ypically . . . sent to our sales office in Taiwan."

Once again, Mosier offers no evidence showing how these materials were used, or what weight a *reasonable*

investor would have placed on them. Reasonable reliance on them is dubious at best. Stonefield's net asset valuation stated its scope was "limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying statement of net assets and, accordingly, do not express an opinion or any other form of assurance on it." As quoted earlier, Stonefield's April 18, 2008 reports on the sale of GVEC's assets stated that the sales were not recorded "in accordance with the accounting principals [sic] generally accepted in the United States of America"; were "sold to an affiliated entity that share[d] the same Advisor as [GVEC]; and "the valuation for the sale price of [GVEC's assets] could not be concluded to be Fair Market Value independently of management's internal valuation." GVEC's Chief Financial Officer Wilbur Quon's evidence that the audit reports were "typically sent" to Taiwan suffers the same infirmity as the rest of Mosier's evidence: what happened to them when they got there?

The district court correctly said that "[t]he record is entirely devoid of any actual, admissible evidence of reliance by anyone – PEMGroup or GVEC principals, investors, or anyone else." The court was correct. We have combed the record from top to bottom and have yet to uncover significant evidence that any part of Stonefield's work product was delivered to a single investor. Without either direct or substantial circumstantial evidence of reasonable reliance, Mosier would simply hold Stonefield liable for granting its "imprimatur to PEMGroup and GVEC." What would amount to a strict liability standard in this context finds no support in the law.

### 5.  Circumstantial Evidence

Mosier repeatedly reminds us that "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence."  Of course he is correct, but he misunderstands the difference in terms of what this means. As the rest of the jury instruction (which he fails to quote) says, "Direct evidence is direct proof of a fact," such as an investor testifying that he relied on Stonefield's audit reports. Circumstantial evidence, on the other hand, "is proof of one or more facts from which you could find another fact."  Ninth Circuit Model Civil Jury Instructions 1.9 (2015).  In other words, the probative value of circumstantial evidence depends entirely upon the strength of the inferences that can be drawn from the proven circumstances, and in this case, whether the equivocal circumstances Mosier offers would be sufficient to support a verdict in his favor.  They are not. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

### 6.  Expert Testimony

The final piece of Mosier's offered evidence was his expert's opinion that a proper reaction by Stonefield "would likely have had a significant adverse effect on attracting and obtaining funds from investors . . . ."  The basis for the expert's "would likely have had" opinion seems to be his experience with how audit reports are generally used.  He did not examine GVEC's sales practices or the specific effect on Stonefield's audits on GVEC's actual investors.  This aspect of the expert's purely speculative opinion therefore does not

support reliance or sufficient evidence of causation to go to a jury.

### 7. The district court did not err in sua sponte dismissing Mosier's unjust enrichment claim.

Although Stonefield challenged Mosier's unjust enrichment claim on summary judgment, Mosier inexplicably did not respond. Normally, we do not consider on appeal issues not properly raised before the district court. Accordingly, Mosier has forfeited this issue. However, even if we were to entertain it, he has no case.

Mosier claimed that Stonefield was unjustly enriched by accepting fees from PEMGroup ($770,365.54) and GVEC ($122,725.33) which Stonefield had earned in a "negligent and reckless" manner by providing defective services. Without the parties' input, the district court dismissed Mosier's unjust enrichment claim, holding that it could not survive in absence of Mosier's other claims. The district court was correct.

After oral argument, we requested Mosier to explain his theory of unjust enrichment against Stonefield. His unpersuasive explanation is that Stonefield earned $894,190 for services that knowingly facilitated PEMGroup's Ponzi scheme, not so much to the financial detriment of the crooked PEMGroup, but to the investors who lost money. Mosier's intention is to return Stonefield's fees to the investors, obviously not to PEMGroup. We are not aware of, nor has Mosier provided us with, any cases supporting this novel "pass through" theory. Moreover, "[A]s a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define

the parties' rights." *Cal. Med. Ass'n, Inc. v. AETNA U.S. Healthcare of Cal., Inc.*, 94 Cal. App. 4th 151, 172 (2001).

The contractual engagement agreement between Stonefield and PEMGroup stated that Stonefield would not be responsible for any misrepresentations made by GVEC.

> We understand that you will provide us with the basic information required for our audit and that you are responsible for the accuracy and completeness of that information. We will advise you about appropriate accounting principles and their application and will assist in the preparation of your financial statements, but the responsibility for the financial statements remains with you. This responsibility includes the maintenance of adequate records and related internal control structure, the selection and application of accounting principles, and the safeguarding of assets. You are responsible for adjusting the financial statements to correct material misstatements and for confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole. Management is also responsible for identifying and ensuring that the entity complies with applicable laws and regulations.

.   .   .

> Because of the importance of management's representations to the effective performance of our services, Genesis Voyager Equity Corporation will release Stonefield Josephson and its personnel from any claims, liabilities, costs and expenses relating to our services under this letter attributable to any misrepresentations in the representation letter referred to above.

If anyone breached this contract, it was PEMGroup, not Stonefield. Mosier admits PEMGroup deceived Stonefield and kept them in the dark about their scheme. Stonefield was not unjustly enriched vis-a-vis PEMGroup, period. PEMGroup got what it deserved: qualified reports. This result was hardly unjust. Unless the investors relied on Stonefield's audit reports, and unless Mosier can prove his claims of negligence and wrongful conversion as an underlying wrong, which he cannot, the investors – who have no standing in this case – are in no better position against Stonefield than PEMGroup. Thus, Mosier's failure to come forward with any substantial evidence of causation as to either claim is also fatal to his claim of unjust enrichment. Ironically, Mosier claims PEMGroup was a victim of unjust enrichment because Stonefield did *not* put them out of business.

## III

## THE RULES GOVERNING SUMMARY JUDGMENT

Mosier argues that the district court overstepped its bounds and ignored the rules of summary judgment. The record read as a whole refutes his claim. Mosier simply did not advance sufficient probative evidence of causation to support a verdict in his favor, and thus to merit consideration by a jury – and the district court said so: "Upon review of the record and the arguments before the Court, the Court concludes that the present motion turns on whether the Receiver has raised a triable fact regarding whether Defendant's conduct caused the alleged losses." The sentences that Mosier cherry-picks out of context from the district court's order do not prove otherwise.

**AFFIRMED**.