**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RENALDO WHITE; RANDOLPH
NADEAU, individually and on behalf
of all others similarly situated,

*Plaintiffs-Appellees*,

v.

SYMETRA ASSIGNED BENEFITS
SERVICE COMPANY; SYMETRA
LIFE INSURANCE COMPANY,

*Defendants-Appellants*.

No.22-35748

D.C. No.
2:20-cv-01866-
MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted October 17, 2023
Phoenix, Arizona

Filed June 20, 2024

Before:  Sandra S. Ikuta, Bridget S. Bade, and Daniel A.
Bress, Circuit Judges.

Opinion by Judge Bress

# SUMMARY[*]

## Class Certification

The panel reversed the district court's certification of two nationwide classes in a putative class action of approximately 2,000 payees who received structured settlement annuities to resolve personal injury claims.

Plaintiffs alleged that defendants Symetra Life Insurance Company and Symetra Assigned Benefits Service Company wrongfully induced them to cash out their annuities in individualized "factoring" arrangements, whereby they gave up their rights to periodic payments in return for discounted lump sums.

Rule 23 of the Federal Rule of Civil Procedure governs class certification, and requires that questions of law or fact common to class members predominate over any questions affecting only individual members.

The panel held that the district court erred in certifying the primary nationwide class, which advanced claims under the Racketeer Influenced and Corrupt Organizations Act and state law. Certification was legally improper because individualized issues of causation will predominate. The record indicates that defendants' allegedly uniform course of conduct was not as uniform as plaintiffs suggest. Even assuming defendants engaged in uniform conduct, plaintiffs have not shown there is a common question of whether such conduct improperly induced plaintiffs to enter into factoring

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

agreements to their detriment. Any assessment of whether defendants' alleged acts and omissions caused plaintiffs to enter the factoring transactions, or led to them accepting inferior factoring deals than they otherwise would have absent the alleged misconduct, would require an analysis of each plaintiff's individual circumstances.

The panel held that the district court erred in certifying a nationwide subclass of plaintiffs whose original settlement agreements with their personal injury tortfeasors contained structured settlement annuity (SSA) anti-assignment provisions. The record indicates that the annuitants hail from a wide array of different states, and some of the settlement agreements have choice of law provisions denoting the law of a state other than the location where the contract was executed. The apparent variations in state law on the enforceability of anti-assignment provisions in SSAs and the need to apply multiple state laws to the subclass raised a substantial question of whether individual issues predominate and how the matter can be fairly managed as a class action.

**COUNSEL**

Alison E. Chase (argued), Keller Rohrback, Santa Barbara, California; Adele A. Daniel, Sydney Read, Gretchen F. Cappio, and Lynn L. Sarko, Keller Rohrback LLP, Seattle, Washington; Edward Stone, Edward Stone Law PC, Greenwich, Connecticut; Jerome M. Marcus and Jonathan Auerbach, Marcus & Auerbach LLC, Spring House, Pennsylvania; Daniel C. Simons, Marcus & Marcus PC, Merion Station, Pennsylvania; for Plaintiffs-Appellees.

Maeve L. O'Connor (argued) and Susan R. Gittes, Debevoise & Plimpton LLP, New York, New York; Medora A. Marisseau, Karr Tuttle Campbell, Seattle, Washington; for Defendants-Appellants.

**OPINION**

BRESS, Circuit Judge:

This is a putative class action of approximately 2,000 payees who received structured settlement annuities to resolve personal injury claims. The plaintiffs later cashed out their annuities in individualized "factoring" arrangements, giving up the right to periodic payments in return for discounted lump sums. The factoring transactions were permitted by federal and state law, and they were approved by state courts, which found that factoring was in the annuitants' best interests. The plaintiffs now claim, however, that the defendants, Symetra Life Insurance Company and Symetra Assigned Benefits Service Company, wrongfully induced the factoring agreements through misrepresentations, unfair business practices, and a

concealed conflict of interest.  The district court certified two nationwide classes under Federal Rule of Civil Procedure 23.  Because individual issues predominate over common ones, we reverse.

I

A

In a structured settlement annuity, or SSA, a tortfeasor or its insurer purchases an annuity to settle a claim, with the victim receiving periodic payments instead of a lump sum. *See Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.*, 39 F.3d 951, 952 (9th Cir. 1994); Daniel W. Hindert, STRUCTURED SETTLEMENTS AND PERIODIC PAYMENT JUDGMENTS § 1.01(2) (2019).  The idea behind these arrangements is to provide for the tort victim's long-term care and expenses.  In an SSA, the tortfeasor oftentimes assigns payment responsibilities to another entity, called an assignment company.  The assignment company purchases an annuity from a life insurance company to facilitate its payment obligations to the tort victim.  To incentivize SSA arrangements, both annuitants and assignment companies receive favorable tax treatment.  *See* 26 U.S.C. §§ 104(a)(2), 130; *Cordero v. Transamerica Annuity Serv. Corp.*, 34 F.4th 994, 997 (11th Cir. 2022) (per curiam).

Annuitants who enter SSAs may later cash out their right to future payments, in whole or in part, in exchange for an immediate discounted lump sum.  *See Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 245 (5th Cir. 2014) (explaining that annuitants "often . . . prefer a large one-time payment in lieu of the smaller payments over time," and that companies can "offer to pay the annuitant a lump sum now in exchange for the right to collect the annuitant's future payments"); *In re Hughes*, 513 S.W.3d 28, 30–31 (Tex. Ct.

App. 2016) (analyzing a case involving a partial assignment). This practice is known as "factoring." Federal and state law permit factoring, but, as one may expect, these transactions are subject to oversight. *See Cordero*, 34 F.4th at 996.

Federal law uses the favorable tax treatment of SSAs to incentivize parties to safeguard factoring transactions from potential abuse. For SSA payments to maintain their preferred tax treatment post-factoring, a state court or other qualifying state authority must find that the factoring agreement complies with federal and state law and is "in the best interest of the payee, taking into account the welfare and support of the payee's dependents." 26 U.S.C. § 5891(b)(2)(A)(ii); *see also TransAmerica Assur. Corp. v. Settlement Cap. Corp.*, 489 F.3d 256, 259–60 (6th Cir. 2007). To implement this, states have enacted Structured Settlement Protection Acts, or SSPAs. *See* Hindert, *supra*, § 16.04(1) ("Starting with Illinois in 1997, every state and the District of Columbia has enacted a form of Structured Settlement Protection Act or SSPA."); *Symetra Life*, 775 F.3d at 245.

State SSPAs require factoring companies and payees to follow specified procedures before a factoring transaction can be carried out. *See* Hindert, *supra*, § 16.04(3). The process differs state by state, but broadly speaking, SSPAs impose disclosure and other procedural requirements and require court approval. Under each state SSPA, factoring companies are required to make written disclosures to the payee "designed to highlight the value of the transferred payments and to contrast that value with the net amount the payee will actually receive." *Id.* § 16.04(3)(a). Some SSPAs mandate the format, language, and even the size of the typeface in these written disclosures. *See, e.g.*, Cal. Ins.

Code § 10136(b).  These disclosures can include required provisions relating to the payee's right to seek and receive independent professional advice on the transaction, *see, e.g.*, Ohio Rev. Code Ann. § 2323.582(J), and itemization of fees and expenses that will be deducted from the gross amount the payee will receive, *see, e.g.*, Neb. Rev. Stat. § 25-3104(1)(b)(v).   Many SSPAs require disclosure of the discounted present value and effective interest rate of the transferred payments.  *See, e.g.*, *id.* § 25-3104(1)(b)(vii)–(viii); Cal. Ins. Code § 10136(c)(6), (8); *Symetra Life*, 775 F.3d at 245–46; Hindert, *supra*, § 16.04(3)(a).  If a factoring company tries to avoid the procedural requirements, the transaction can be denied, and fees and costs can be awarded against the company.  Hindert, *supra*, § 16.04(3)(c); *Symetra Life*, 775 F.3d at 246.

Advance court approval is the "cornerstone" of both state and federal law in this area.  Hindert, *supra*, § 16.04(3)(b). To consummate their transaction, the payee and factoring company obtain from a state court or other competent body a finding that factoring "will serve the best interests of the payee and the payee's dependents and/or is necessary to enable them to avoid hardships," and will not contravene any applicable law.   *Id.*; *see also, e.g.*, Cal. Ins. Code § 10139.5(a) (deeming ineffectual the transfer of structured settlement payment rights "unless the transfer has been approved in advance in a final court order"); Wash. Rev. Code. § 19.205.030.  Many SSPAs call for the court to find that the factoring company complied with the relevant disclosure obligations.  *See, e.g.*, W. Va. Code § 46A-6H-3(f)(2).  SSPAs also often require either a finding "that the payee has received 'independent professional advice' concerning the proposed transfer" or that the payee was advised to do so and waived that right.  Hindert, *supra*

§ 16.04(3)(b); *see, e.g.*, Tex. Civ. Prac. & Rem. Code § 141.004(2). The approval process typically involves a hearing in which a state court judge considers the context of the transaction and the payee's needs for immediate funds. *See* Hindert, *supra*, § 16.05(4)(a); Va. Code Ann. § 59.1-477(B).

Ultimately, the state court must make an independent determination that the factoring transaction is in the payee's "best interest." 26 U.S.C. § 5891(b)(2)(A). This test "refers to the personal circumstances of the individual seeking an immediate cash sum," and "is akin to . . . best interest determinations" made in family, probate, or guardianship proceedings. Hindert, *supra*, § 16.05(4)(a). The "best interest" of a payee can also be legislatively defined. California's SSPA, for example, provides fifteen non-exclusive factors that a state court must consider when making this determination. *See* Cal. Ins. Code § 10139.5(b).

Some state SSPAs take this a step further and require that any factoring transaction be adjudged "fair and reasonable." Hindert, *supra*, § 16.05(4)(a). This standard "is largely associated with the difference between what is being paid in cash by the transfer company and the aggregate value of the future payment rights being acquired." *Id.*; *see also, e.g.*, Cal. Ins. Code § 10139.5(b)(9) (requiring an approving court to consider "[w]hether the financial terms of the transaction, including the discount rate[,] . . . the expenses and costs of the transaction[,] . . . [and] the available financial alternatives to the payee . . . are fair and reasonable").

In sum, the state court approval process is designed to evaluate each transaction individually and to protect annuitants when they engage in factoring.

B

Defendant Symetra Assigned Benefits Service Company (SABSCO) operated as an SSA assignment company that assumed the obligations of tortfeasors to make periodic payments to tort victims.  To make these payments, SABSCO purchased SSAs from an affiliated entity, defendant Symetra Life Insurance Company (Symetra Life).  After concluding that SSAs could become unprofitable over time, the defendants in the mid-2000s began soliciting their annuitants to enter factoring transactions.  When a tort victim elected to factor, SABSCO would purchase from the annuitants at a discounted price the stream of SSA payments that Symetra Life was issuing through its annuities.

To market their factoring opportunities, the defendants sent solicitations to eligible annuitants on a quarterly basis through mass mailings, newsletters, and emails.  An exemplar mailing informed annuitants that due to changed circumstances, they might "face the need for cash now, perhaps to pay for education, buy a home, or to pay off debt," inviting annuitants to contact SABSCO to learn more.  Some of these mailings described the defendants as the annuitants' "friends."  In others, the defendants told annuitants that they would "be your advocate."

Although these initial communications were standardized, the process became more individualized to the annuitant as it went along.  Annuitants interested in factoring would start a one-on-one process that typically began with a call between the annuitant and a company representative.  The representative would ask questions specific to the annuitant concerning his or her personal situation, including his or her reasons for the desired sale, prior sale history, and financial needs and goals.  Based on this information from

the annuitant, the representative would then prepare an initial quote for consideration.

The two named plaintiffs' experiences provide a window into why some annuitants pursue factoring and how it works in practice.  Plaintiff Renaldo White was hit by a truck at age ten and received a settlement to be paid out over his life. Later, White began exploring opportunities to cash out the settlement.  White received mailings from both Symetra and another factoring company, although Symetra ultimately stopped sending White brochures in the early 2000s.  White spoke with both Symetra and its competitor about factoring his settlement.  Although Symetra "had a better deal at that time," White chose to factor with the other company because he had already factored with it before.

Over several years, White factored with three different companies, including the defendants.  White had one-on-one contact with the defendants' representatives dozens of times during this period, as he explored his factoring options.  In 2011, White decided he needed immediate access to funds to pay for his wedding and the upcoming birth of his first child.  White ultimately agreed to sell to SABSCO his right to (life-contingent) monthly payments worth an estimated $695,000 for an immediate $18,609 payment, representing an effective annual interest rate of 15.03% per year.

At this time, White ratified that "I have determined that completing this transaction with Symetra Assigned Benefits Service Company is in my best interest and will improve my quality of life."  At his deposition in this case, White testified that the factoring transaction "was in my best interests at that time."   White further agreed he was aware, based on documents, that under his SSA "Symetra Assigned Benefits Service Company is primarily obligated to make the periodic

payments which are funded by an annuity issued by Symetra Life."

A Tennessee state court approved White's factoring transaction. White filed an affidavit in this proceeding acknowledging that SABSCO was "[t]he entity presently obligated to make payments due under the structured settlement," and that "[i]n order to fund its payment obligations under the structured settlement," SABSCO "purchased an annuity contract . . . from Symetra Life Insurance Company." White in his affidavit further stated that he was "voluntarily enter[ing]" into the transaction, that he had "carefully reviewed the Disclosure Statement and fully and completely" understood its terms, and that after SABSCO "advised [him] to seek independent professional advice," White "knowingly waived said advice in writing." White likewise confirmed his "understand[ing] that the Assignment Payments will go to [SABSCO]."

Based on his upcoming wedding, the imminent birth of his child, and his related need to secure a larger residence, White told the state court "that this transaction is in my best interest," "believ[ing] this is an efficient use of my money and that I will be investing in my own future." In accordance with Tennessee law, Tenn. Code Ann. § 47-18-2603, the judge reviewing White's transaction would have considered whether appropriate disclosures were made and that White was advised to seek independent professional advice. To approve the transaction, the court was required to further find that White "has established that the transfer is fair and reasonable and in the best interest of the payee." Tenn. Code Ann. § 47-18-2603(3).

The second named plaintiff in this case, Randolph Nadeau, received a structured settlement after he was injured

by a piece of falling cast iron at a construction site.  Nadeau engaged in four factoring transactions with SABSCO between 2006 and 2020.   One of these transactions discounted his payments at an 18% interest rate.

Like White, Nadeau had multiple discussions with the defendants' representatives before entering these transactions.  In one conversation, Nadeau called in to follow up on a few quotes he had been provided in a previous conversation.  When the representative asked Nadeau how he would use the money, Nadeau explained that he needed funds to pay back taxes on an apartment building he owned and to put a new roof on his house.  At that point, the SABSCO representative asked Nadeau if he had "looked into any other options to finance this," such as a loan. Nadeau rejected the idea, explaining that he "want[ed] to do it" by himself and that he had two other sources of income. After the representative again suggested that a loan might be more cost-effective, Nadeau questioned whether he would qualify for a loan, reiterating his desire to pursue factoring.

Once they had reached an agreement, the parties presented their proposed transaction to a New York state court for approval.   We use Nadeau's 2020 factoring arrangement as an example of how this process worked. During these 2020 proceedings, Nadeau submitted an affidavit acknowledging that SABSCO was obligated to make his payments and that to fund those payment obligations, SABSCO had purchased an annuity from Symetra Life.  Nadeau acknowledged that Symetra's counsel was not representing his interests and that SABSCO had advised him in writing to seek independent professional advice on the arrangement, which he had either received or knowingly waived.  Nadeau in his affidavit also declared that he had reviewed a disclosure statement on the transaction's

terms and that the transaction was in his best interest.  At his deposition in this case, Nadeau was asked, "did you understand that Symetra Assigned Benefits Service Company 'SABSCO' was likely to profit from this?"  He replied, "Of course."

A state court judge in New York examined the structure of Nadeau's payments, the aggregate amount of the payments, the discounted present value, and the gross amount payable to Nadeau.  The judge confirmed that Nadeau had waived his right to consult an attorney or other advisor about the transaction.  Nadeau testified that he did not need any advice because he was sixty-five years old and had "run a couple of businesses and I've got the experience in what I'm asking for."  Nadeau explained that he had another source of income from his rental business, but that he had "fallen behind a little bit on taxes" and that the roof on his home needed replacing.  Nadeau also said he had a tree service business that was "starting to pick up," so he could "let this money go, because I've got other income coming in."

The state court judge was careful to tell Nadeau that he was "expecting a payment to be approved today, of less than half" the value of the payments he could otherwise receive, to which Nadeau said, "I know."  Nadeau thanked the judge "for being so thorough," confirming that he had "run the expenses," had "quite a lot of experience," and that "after thinking it all over, it's the best thing right now for me to do at my age."  After giving "careful consideration" to Nadeau's testimony and the governing law, the judge approved the transaction, finding it fair and reasonable and in Nadeau's best interests.

C

In 2021, White and Nadeau filed this putative class action against Symetra Life and SABSCO, alleging that the defendants unlawfully induced annuitants to enter factoring transactions to their detriment. A key allegation in this case is that because the defendants were the issuer and obligor in the SSAs, they improperly used their knowledge of the annuitants to solicit them into entering predatory and inequitable factoring arrangements—arrangements in which defendants stood to profit and had a conflict of interest. The plaintiffs allege that defendants "weaponize[d] Symetra's position of 'trust' with its annuitants to induce them into selling off their future financial security."

The plaintiffs advanced claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) and the Washington Consumer Protection Act (WCPA). They also asserted state law claims for breach of the duty of good faith and fair dealing, breach of fiduciary duty, breach of contract, tortious interference with contract, civil conspiracy, and unjust enrichment.

White and Nadeau moved to certify a nationwide class of nearly 2,000 individuals who sold their Symetra-issued SSA payment rights to SABSCO between 2005 and 2020. The plaintiffs also moved to certify a nationwide breach-of-contract subclass consisting of hundreds of persons whose original settlement agreements with their tortfeasors contained language stating that the annuitants lacked the "power" to assign their payments.

Except for the breach of fiduciary duty claim, which could not be certified due to the lack of any underlying fiduciary duty, the district court certified plaintiffs' claims under Federal Rule of Civil Procedure 23. In its ruling, the

court focused on the "[c]ommon, uniform marketing materials" that the defendants used to solicit annuitants for factoring transactions. To satisfy the element of causation, the court held that these marketing materials gave "rise to a common sense inference that no individual would factor with a company whose rates are subpar and whose transactions are not in the individual's best interest, unless that individual relied on the representations." The court certified the following two classes:

> Nationwide Class: "All persons who are or were, at any time, annuitants of an SSA that contemplated life contingent payments issued by Symetra and who subsequently sold to a Symetra affiliate the right to receive payments from that SSA in a factoring transaction."

> Nationwide Subclass: "All members of the Class whose contract defining the annuity at issue included language explicitly stating that the annuitants lack the power to transfer their future SSA payments."

A motions panel of this court granted the defendants' petition for leave to appeal the district court's class certification decision. *See* Fed. R. Civ. P. 23(f). We have jurisdiction under Rule 23(f) and 28 U.S.C. § 1292(e). We review the district court's class certification decision for abuse of discretion. *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1138 (9th Cir. 2022). We review the district court's decision granting class certification with more deference than we would a denial of class certification. *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1232 (9th Cir.

2024).   Notwithstanding this deference, the district court abuses its discretion if it "applie[s] an incorrect legal rule or if its application of the correct legal rule [i]s based on a 'factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014) (quoting *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013)).[1]

## II

Rule 23 of the Federal Rules of Civil Procedure governs class certification.  "Under Rule 23, a class action may be maintained if the four prerequisites of Rule 23(a) are met, and the action meets one of the three kinds of actions listed in Rule 23(b)." *Van v. LLR, Inc.*, 61 F.4th 1053, 1062 (9th Cir. 2023).  Under Rule 23(a), the plaintiffs must establish numerosity, typicality, and adequacy of representation— none of which are disputed here—as well as commonality. Commonality means that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation and internal quotation marks omitted, alteration in original).  The plaintiffs here sought to certify a damages class under Rule 23(b)(3).  That provision requires that "questions of law or fact common to class

---

[1] We reject as unsupported plaintiffs' contention that defendants waived various arguments by not raising them below.

members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).

The commonality and predominance inquiries overlap. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc).  The commonality requirement rests on the premise that "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation and internal quotation marks omitted).  Thus, the plaintiffs' "claims must depend upon a common contention," and that contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*  Rule 23(b)(3), in turn, requires that these common questions predominate over individual ones: "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453 (citation and internal quotation marks omitted).

As the parties seeking class certification, the plaintiffs "must affirmatively demonstrate [their] compliance with" Rule 23, *Wal-Mart Stores*, 564 U.S. at 350, by a preponderance of the evidence, *see Olean Wholesale*, 31 F.4th at 665.  To make their required showing, plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (emphasis in original).  Courts may

only certify a class if they conclude, "after a rigorous analysis, that the prerequisites" of Rule 23 have been met. *Wal-Mart Stores*, 564 U.S. at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

## III

We start with the primary nationwide class. For this class, the district court certified the following claims: civil RICO, the Washington Consumer Protection Act (WCPA), unjust enrichment, civil conspiracy, good faith and fair dealing, and tortious interference.[2] We hold that the district court erred in certifying the nationwide class because individual issues of causation will predominate over common ones when evaluating whether defendants' acts and omissions caused the plaintiffs to enter factoring transactions and incur their alleged injuries.

## A

In "considering whether questions of law or fact common to class members predominate," we "begin[] . . . with the elements of the underlying cause[s] of action." *Olean Wholesale*, 31 F.4th at 665 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011))

---

[2] In their briefing, plaintiffs are unclear as to whether the good faith and fair dealing and tortious inference claims are associated with the breach of contract claim that is the subject of the subclass. The district court's decision groups these claims with the breach of contract claim as part of a larger category of "contract claims," but the decision does not explain whether these claims were certified for either the larger class or subclass. Similarly, in the plaintiffs' operative complaint, only the breach of contract claim is denoted as being asserted on behalf of the subclass. For avoidance of doubt, we will assume for purposes of our analysis that these two claims are also part of the primary nationwide class and will analyze them accordingly.

(alteration and internal quotation marks omitted).  Here, the critical element in each of the relevant claims is the requirement that the defendants' alleged wrongdoing caused the plaintiffs' alleged harm by inducing them to enter into factoring agreements to their detriment.

Through its statutory text allowing any person injured "by reason" of RICO's criminal prohibitions to bring suit, 18 U.S.C. § 1964(c), RICO requires a showing of "but for" and proximate cause, *see Hemi Grp., LLC v. City of N.Y., N.Y.*, 559 U.S. 1, 9 (2010) ("[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'" (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992))).  RICO's causation requirement is also expressed through the legal element of reliance.  *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008); *Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1259–60 (9th Cir. 2019).

Plaintiffs' state law claims likewise require that the defendants' wrongdoing caused the plaintiffs' injuries.  The WCPA requires "causation" as an element, in that "[a] causal link is required between the unfair or deceptive acts and the injury suffered by plaintiff."  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 539 (Wash. 1986); *see also, e.g.*, *Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 976 (9th Cir. 2016) (listing causation as an element of a WCPA claim).  For civil conspiracy, the plaintiffs must prove "(1) two or more people combined *to accomplish* an unlawful purpose, or combined *to accomplish* a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement *to accomplish* the conspiracy."  *All Star Gas, Inc. of Wash. v. Bechard*, 998 P.2d 367, 372 (Wash. Ct.

App. 2000) (emphasis added).  As plaintiffs explain in their answering brief, Washington law governing civil conspiracy claims "requires that the defendants' unlawful purpose or unlawful means proximately resulted in the plaintiffs' harm."  *See also Couie v. Local Union No. 1849 United Broth. of Carpenters and Joiners of Am.*, 316 P.2d 473, 478 (Wash. 1957).  Tortious interference likewise requires "an improper purpose or the use of improper means by the defendant that caused the interference."  *Eugster v. City of Spokane*, 91 P.3d 117, 123 (Wash. Ct. App. 2004).

Finally, although Washington law does not include an express causation requirement in its articulation of the elements of the torts of unjust enrichment and breach of the duty of good faith and fair dealing, those claims of necessity require a causal link between the alleged wrong and the plaintiffs' harm.  *See generally Mosier v. Stonefield Josephson, Inc.*, 815 F.3d 1161, 1173 (9th Cir. 2016) (explaining that the plaintiff's "failure to come forward with any substantial evidence of causation . . . is also fatal to his claim of unjust enrichment"); *Sitton v. State Farm Mut. Auto. Ins. Co.*, 63 P.3d 198, 206 (Wash. Ct. App. 2003) (reversing a class action trial plan on a good faith and fair dealing claim where the plan "allows the jury to make a damages award without requiring individual claimants to establish causation and damages" and the "effect of the plan is to eliminate causation as an element of plaintiffs' bad faith" claim).  This explains why the relevant sections in plaintiffs' operative complaint allege at length how the defendants' supposedly unjust and bad faith conduct led to the plaintiffs entering the factoring transactions, to their detriment.

Ultimately, these additional claims are just different ways of restating plaintiffs' core theory: that defendants deceived      annuitants      into      unfavorable      factoring

arrangements. To the extent plaintiffs argue that any of their state law theories would permit them to prevail on a claim asserting only freestanding wrongs that had no bearing on their alleged injuries or did not cause them, they cite no Washington law that would support such an unmoored theory.

Plaintiffs point out that each of their claims includes other elements in addition to causation, such as whether defendants committed "unfair" or "deceptive" business practices or engaged in conduct that was otherwise "unjust." But even if plaintiffs demonstrate that there are common questions of law or fact with respect to these other elements, this does not perforce establish that these questions predominate over individualized questions of causation. Unjust enrichment, for example, requires consideration of the full "circumstances" of the transaction, *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008), not merely those aspects of the arrangement that plaintiffs claim are inequitable. Focusing on one element of a state law claim to the exclusion of others—most notably here, the requirement of causation—at most generates a potential common question, not one that necessarily predominates in any given case. For purposes of the Rule 23 analysis, plaintiffs must demonstrate, on a class-wide basis through common proof, *see Wal-Mart Stores*, 564 U.S. at 349–50; *Olean Wholesale*, 31 F.4th at 666, that defendants' alleged wrongdoing caused plaintiffs' injuries, and that such common questions of causation predominate over any individualized ones.

## B

In this case, we hold that certification of the primary nationwide class was legally improper because

individualized issues of causation will predominate.  *See Tyson Foods*, 577 U.S. at 453.

To support causation, plaintiffs point to the defendants' allegedly undisclosed conflict of interest, exploitative leveraging of their knowledge of the annuitants' financial circumstances, and dissemination of misleading marketing materials.    The record indicates, however, that the defendants' allegedly uniform course of conduct was not as uniform as plaintiffs suggest.  For example, the marketing materials on which plaintiffs base their misrepresentation theory were not uniform in content over time, nor did every annuitant receive them (plaintiff White himself stopped receiving mail from the defendants in the early 2000s).  The defendants also communicated with each annuitant individually, through ways other than mass marketing materials.  Some annuitants, meanwhile, were the primary initiators of their factoring transactions and contacted the defendants to get the process underway.  The course of interactions that plaintiffs claim was unlawful was a good deal more varied than they indicate.

But even assuming defendants engaged in uniform conduct, plaintiffs have not shown there is a common question whether such conduct improperly induced plaintiffs to enter into factoring agreements to their detriment.  Here, resolving the critical element of causation will require consideration of individualized issues that swamp the assertedly common ones.  Because "individualized causation issues would predominate in this case," *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 658 (9th Cir. 2004), any "common, aggregation-enabling, issues" are not "more prevalent . . . than the non-common, aggregation-defeating, individual issues," *Tyson Foods*, 577 U.S. at 453 (internal quotation marks and citation omitted).

The reason lies in the nature of the factoring transactions and the state court processes that led to their approval.  The record bears out the highly individualized circumstances that led the plaintiffs to factor their SSAs, and the highly individualized state proceedings that evaluated whether these transactions were in particular plaintiffs' best interests.  As we described above, plaintiff White, who had already factored with other companies, contacted defendants because he needed money for his wedding and the birth of his child.  Plaintiff Nadeau wanted immediate funds to pay back taxes on an apartment building to avoid its foreclosure and to fix the roof of his home.  Both plaintiffs had numerous one-one-one discussions with the defendants.        Both plaintiffs signed disclosures and affidavits acknowledging the defendants' respective roles in the SSAs and factoring arrangements and their right to seek independent professional advice.  Both plaintiffs repeatedly attested that the factoring transactions were in their best interests.  Both were adamant that they wanted these arrangements.  And state courts independently reviewed each plaintiff's factoring agreement in specialized proceedings, approving a particular arrangement only after finding that it complied with applicable law (including disclosure requirements) and was in the plaintiff's best interests.

Any assessment of whether defendants' alleged acts and omissions caused the plaintiffs to enter the factoring transactions, or led to them accepting inferior factoring deals than they otherwise would have absent the alleged misconduct, would require an analysis of each plaintiff's individual circumstances—including their understanding of the transaction and motivations.  The result would be 2,000 mini-trials on causation.  This is therefore a situation in which "the individual circumstances of particular class

members" will clearly "bear on" the causation inquiry. *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 460 (2013). Indeed, the individual circumstances would play a central role in that inquiry. *See Poulos*, 379 F.3d at 665 (affirming the denial of class certification because, "[i]n this case, individualized reliance issues related to plaintiffs' knowledge, motivations, and expectations bear heavily on the causation analysis").

To determine whether defendants' conduct induced plaintiffs to enter into a factoring agreement to their detriment, the court would need to examine the unique circumstances that led the annuitant to consider factoring, the details of each plaintiff's one-on-one communications with the defendants, and the disclosures made to each plaintiff, including about the defendants' respective roles (White and Nadeau both received such information). *See Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 424 (5th Cir. 2004) (explaining that class certification is improper when "a court would have to hear evidence regarding *each purported class member and his transaction*" because "[s]uch an individual examination would destroy any alleged predominance present in the proposed class"). And, perhaps most critically from a causation standpoint, a court evaluating plaintiffs' legal theories would need to consider the state court proceedings that, after the required inquiries, approved the factoring transactions as in the annuitants' best interests. Those proceedings were necessarily individualized to each annuitant, and they would also differ across states based on differences in the underlying state SSPAs. What was said and done in these state court proceedings is an important and necessary part of the causal chain that led to the plaintiffs factoring their SSAs, and is crucial to the determination of whether the

plaintiffs accepted a worse deal than they otherwise would have.  Each individual case would need to be examined to determine whether, and to what extent, the individualized circumstances of each plaintiff and their state court proceedings overrode defendants' alleged misconduct.

Thus, whether the defendants' alleged misrepresentations and omissions induced plaintiffs to enter into unfavorable factoring arrangements cannot be answered without examining the full extent of the plaintiffs' circumstances, their communications with defendants, their understanding of the deals they were entering, and the proceedings in the state courts that approved them.  Given the personalized nature of the factoring transactions and the accompanying state court review process, the causal chain here is simply too individualized and multi-dimensional to permit the conclusion that the assertedly common issues are more prevalent than the non-common ones.  *See Tyson Foods*, 577 U.S. at 453.

## C

The district court reached a different conclusion by applying a "common sense inference of reliance."  In the district court's view, "[c]ommon, uniform marketing materials that are misleading and designed to capitalize on a pre-existing relationship give rise to a common sense inference that no individual would factor with a company whose rates are subpar and whose transactions are not in the individual's best interest, unless that individual relied on the representations."  In other words, the district court concluded there was no need to conduct an individualized inquiry into whether defendants' conduct had induced a particular plaintiff into entering a factoring agreement to the plaintiff's

detriment because under the circumstances, a trier of fact could reasonably infer as much.

This reasoning, we respectfully conclude, reflects legal error. Even if each plaintiff were exposed to some uniform information, it is difficult on these facts to make a common sense inference that this information induced the plaintiff to enter into a factoring agreement. Nor can we surmise, as the district court did, that the factoring transactions were "not in the individual's best interest," when the state courts that approved these transactions concluded the opposite. Regardless, any after the fact determination that factoring was not in the annuitants' best interests would require an analysis of the individual circumstances of each transaction.

But more broadly, we conclude that a "common sense inference of reliance"—or common sense inference of causation (reliance being one way to prove causation)—is not appropriate on these facts. The district court reached its conclusion by relying on cases from other circuits that involved more linear chains of causation. Those cases are materially different from this one.

For example, in *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013), the Second Circuit considered a straightforward case of fraudulent overbilling. It held that "[i]n cases involving fraudulent overbilling," the fact of payment can reflect "circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed." *Id.* at 120. Similarly, the Eleventh Circuit in *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004), *abrogated in part on other grounds as recognized in Green-*

*Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 893 (11th Cir. 2023), considered a "simpl[e]" case of misrepresentation where physicians were not paid what they were told they would be. A common sense inference of reliance was appropriate because the plaintiffs "assumed they would be paid the amounts they were due." *Id.*

We have had limited occasion to address the permissibility of this kind of inference, but we have not applied it when the causal inquiry is more complex. Most particularly, in *Poulos*, we considered a putative class action brought on behalf of patrons who claimed that casinos had misled them about their opportunities to win at video poker and electronic slot machines by misrepresenting that the newer electronic games operated like the traditional games on which they were based. 379 F.3d at 659–60. Citing "the unique nature of gambling transactions," we held that individualized issues of causation predominated because "[g]amblers do not share a common universe of knowledge and expectations." *Id.* at 665. We further held that any common sense inference of reliance based on circumstantial evidence was likewise unjustified. *Id.* at 667–68. Unlike cases where consumers "'pa[id] a fee for a service'" that was simply unavailable—where "[t]he only logical explanation for such behavior is that the class members relied on defendants' representation"—"[n]o such 'common sense' or 'logical explanation' serves to link the gambling patrons and their use of gaming machines." *Id.* at 668 (alteration omitted) (quoting *Peterson v. H & R Block Tax Servs., Inc.*, 174 F.R.D. 78, 85 (N.D. Ill. 1997)).

In *Owino v. CoreCivic, Inc.*, 60 F.4th 437 (9th Cir. 2022), *as amended*, by contrast, we concluded, albeit in a brief discussion, that a class-wide inference of causation was appropriate. *Id.* at 446. In that case, detainees sued a private

immigration detention center alleging that they were forced to perform labor against their will and without compensation. *Id.* at 441. The plaintiffs pointed specifically to the detention center's written policies, which required detainees to engage in various tasks. *Id.* at 442. We held that the plaintiffs had established proof of causation under the Victims of Trafficking and Violence Protection Act of 2000, 18 U.S.C. § 1589 *et seq.*, because "a factfinder could reasonably draw a class-wide causation inference" from the detention center's uniform policies. *Owino*, 60 F.4th at 446.

*Poulos* and *Owino* bear out our observation that whether a class-wide inference of reliance or causation is appropriate "depends on the context." *Id.* (citing *Poulos*, 379 F.3d at 665–66). We agree with the Tenth Circuit that a class-wide inference of causation or reliance is inappropriate when the "unique facts surrounding the class claims . . . involve significant individualized or idiosyncratic elements that reasonably preclude the predomination of common questions." *CGC Holding Co. v. Broad and Cassel*, 773 F.3d 1076, 1092 (10th Cir. 2014).

That is the case here. A presumption of causation or reliance is not appropriate in the matter before us because significant individualized issues of causation predominate over any common ones. As in *Poulos*, this is not a situation where "[t]he only logical explanation for [the plaintiffs'] behavior is that the class members relied on [defendants'] representation[s]." 379 F.3d at 668 (internal quotation marks omitted, third alteration in original); *see also id.* at 665 ("Even taking the Class Representatives' allegations as true, however, and assuming that all plaintiffs in the proposed classes suffered financial loss or other concrete injury as a consequence of playing the machines, it does not necessarily follow that plaintiffs' injuries are causally linked to the

Casinos' alleged misrepresentations."). Nor is this case comparable to ones involving simple fraudulent overbilling, in which the bare fact of payment can demonstrate causation.

The causal story here is, instead, quite complex. For as we have discussed, this case presents significant individualized issues of causation rooted in the personal circumstance-driven factoring transactions and the state court proceedings that validated them. Presuming that defendant's alleged misrepresentations and omissions induced plaintiffs to enter into the factoring agreements to their detriment would improperly assume away the intensive causation issues specific to each putative class member.[3]

---

[3] Plaintiffs similarly argue that they are entitled to a presumption of causation and reliance under the WCPA. Washington law recognizes such a rebuttable presumption for claims grounded in omissions, premised on the idea that otherwise the person seeking relief would have to prove a negative. *Deegan v. Windermere Real Estate/Ctr.-Isle, Inc.*, 391 P.3d 582, 587–88 (Wash. Ct. App. 2017). But the plaintiffs' claims here are not limited to omissions and turn significantly on defendants' alleged misrepresentations. Plaintiffs do not identify Washington law that applies a presumption of causation or reliance in cases involving both misrepresentations and omissions. And we have explained in other contexts that these presumptions "appl[y] only in cases primarily involving 'a failure to disclose'—that is, cases based on omissions as opposed to affirmative misrepresentations." *Poulos*, 379 F.3d at 666 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972)). In "mixed claims" such as this, the plaintiffs "would not be entitled to the presumption." *Id.*; *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liability Litig.*, 2 F.4th 1199, 1202 (9th Cir. 2021) (holding in securities fraud case that presumption of reliance did not apply because the allegations "cannot be characterized primarily as claims of omission"). Plaintiffs identify no WCPA case law following a different approach.

In sum, because individualized causation issues predominate over any common ones, the district court erred in certifying the principal nationwide class.

IV

The district court also certified a nationwide subclass of plaintiffs whose original settlement agreements with their tortfeasors contained language stating that the annuitant lacked the power to assign SSA payments. Representative "power language" from one contract reads as follows: "The Claimant . . . shall not have the power to sell, mortgage, anticipate or encumber these payments, or any part thereof, by assignment or otherwise."

Defendants were not parties to these contracts. Instead, plaintiffs claim that because SABSCO took on the duties to make SSA payments, "SABSCO stepped into the shoes of the defendant that was an original party to each Power Language Settlement Agreement." Plaintiffs' breach of contract claim, which is brought only against SABSCO, alleges that SABSCO violated the "no power" anti-assignment provisions when it participated in factoring transactions with the annuitants. The district court certified this claim (and, it appears, the breach of the duty of good faith and tortious interference claims) as a nationwide subclass. We question whether a plaintiff who agreed not to assign his or her right to payments from a tortfeasor, but then nevertheless made such an assignment, can bring a breach of contract action against a third party that is fulfilling the tortfeasor's duty to make the payments. But even assuming SABSCO could be liable for the breach of the tortfeasor-claimant settlement agreement, we hold that the record does not support certification of the subclass as defined.

We may briefly dispense with some of the defendants' arguments at the outset. Although the contracts at issue do differ in their particulars, the language of the "no power" provisions is substantially the same, motivated, in no small part, by the fact that the contracts were mirroring a federal prohibition against accelerating, deferring, increasing, or decreasing annuity payments. *See* 26 U.S.C. § 130(c)(2). Further, as the district court noted, plaintiffs "have limited the class to those contracts which include the limitation on transfers," *i.e.*, those contracts with "no power" language. The language of the contracts is thus insufficient to preclude class certification.

But a more substantial problem lies in the law that will govern the anti-assignment provisions, given the apparent variations in state law on the enforceability of anti-assignment provisions in structured settlement agreements. We have explained that "'understanding which law will apply before making a predominance determination is important when there are variations in applicable state law,'" and that "potentially varying state laws may defeat predominance in certain circumstances." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 928 (9th Cir. 2019) (alteration omitted) (quoting *Zinser v. Accufix Rsrch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001), *as amended at* 273 F.3d 1266 (9th Cir. 2001)). Indeed, "[w]e have been particularly concerned about the impact of choice-of-law inquiries in nationwide consumer class actions . . . ." *Id.* (first citing *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 585, 591–94 (9th Cir. 2012); and then citing *Zinser*, 253 F.3d at 1184–90); *see also Mazza*, 666 F.3d at 596 ("Because the law of multiple jurisdictions applies . . . variances in state law overwhelm common issues and preclude predominance for a single nationwide class."); *Pilgrim v. Universal Health*

*Card, LLC*, 660 F.3d 943, 948–49 (6th Cir. 2011) (collecting Third, Fifth, Sixth, Seventh, and Ninth Circuit cases in which courts "refused to allow a nationwide class covered by the laws of different States").

The need to apply the law of different states raises questions of whether individualized issues predominate and how a matter can be fairly managed as a class action. *See id.* at 948; *Zinser*, 253 F.3d at 1189; *see also Jabbari v. Farmer*, 965 F.3d 1001, 1006 (9th Cir. 2020) ("The potential applicability of variations in state law can complicate the predominance determination."). And it is the plaintiffs' burden at the Rule 23 stage to demonstrate predominance in the face of the need to apply multiple states' laws. *See Zinser*, 253 F.3d at 1189; *see also Wal-Mart Stores*, 564 U.S. at 350.

In this case, the record contains four SSA settlement agreements, three of which have choice of law provisions, each of which calls for the application of the laws of a different state—Arizona, California, and Michigan. The fourth agreement lacks any choice of law provision. In an earlier partial summary judgment ruling in this case, the district court ruled that in the absence of a choice of law provision, Washington law would govern (meaning that Washington law governs the fourth agreement here), but that valid choice of provisions in the contracts would be honored. In its class certification decision, the district court similarly explained that "[t]o the extent there is a valid and

enforceable choice of law provision, the Court will apply the law provided for in the contract."[4]

As the record stands, then, at least four different states' laws will need to be applied to the subclass, and that is based only on the four agreements before us.  It would appear many more states' laws may also be implicated.  Indeed, materials in the record indicate that the annuitants hail from a wide array of different states, and some of the settlement agreements have choice of law provisions denoting the law of a state other than the location where the contract was executed.  Taken as a whole, the evidence in the record to date is sufficient to raise a substantial question of whether the plaintiffs can demonstrate predominance given the need to apply multiple states' laws.  *See Van*, 61 F.4th at 1068–69 (holding that where "at least eighteen" of the 13,680 discounts reflected a material difference, this "summon[ed] the spectre of class-member-by-class-member adjudication," "even though" it was based on "only a small number of invoices").

And in this case, the specific difficulty that arises from the need to apply the laws of different states to the subclass is that state law may vary on the enforceability of anti-assignment provisions in SSA agreements.  The district court itself recognized that "courts have come out differently as to the enforceability of antiassignment provisions."  As one state supreme court has described it,

---

[4] The district court's earlier summary judgment ruling on choice of law is not directly before us, but we discuss it because it informed the court's later certification of the subclass.  We do not consider here whether the district court correctly concluded that, in the absence of a choice of law provision, Washington law would govern the contract-based claims.

> The courts addressing the precise issue of whether an anti-assignment provision in a structured settlement agreement prohibiting the alienation of future payments made under an annuity policy is enforceable have reached differing results.    No clear majority has emerged.    Rather, the decisions are divided almost evenly.

> The jurisdictions striking anti-assignment provisions have done so: on the basis that no harm comes to the party obligated to perform by the mere assignment of contractual payments; due to a lack of specific language binding the tort victim to assignment restrictions; or because the anti-assignment provisions circumscribe the right, but not the power, to assign. The courts enforcing anti-assignment provisions in the structured settlement context have grounded their decisions on: the premise that such provisions, included for the benefit of the insurer, could not be waived by the annuitant; policy arguments supporting enforcement of the provisions in relation to structured settlements; or the clear language of the provision taking it out of the general rule of assignability.

*In re Kaufman*, 37 P.3d 845, 852–53 (Okla. 2001) (footnotes and citations omitted) (holding that unambiguous anti-assignment provisions in SSAs are valid but that annuitant could not enforce it against his assignee); *see also In re Rapid Settlements Ltd's Application for Approval of*

*Structured Settlement Payment Rights v. Symetra Assigned Benefits Serv. Co.*, 136 P.3d 765, 775 (Wash. Ct. App. 2006) ("Courts in other jurisdictions have taken differing approaches to antiassignment clauses in structured settlement agreements."); Philip Eden, et. al, *Evaluation of Structured Settlements*, 31 Am. Jur. Trials 595 §§ 35.1–35.4 (May 2024) (collecting cases concerning assignments of structured settlement rights and describing varying approaches taken in cases concerning enforceability and the effect of SSPAs on assignments); Jay M. Zitter, *Construction and Application of State Structured Settlement Protection Acts*, 27 A.L.R.6th 323 §§ 11–13 (originally published 2007, updated 2024) (collecting cases reflecting different approaches on enforceability and other issues relating to assignments).

The plaintiffs maintain that cases finding anti-assignment clauses ineffective did not involve the situation here, in which the defendants had conflicted roles. But plaintiffs point to no authority from any jurisdiction addressing the enforceability of anti-assignment clauses in these circumstances, and resolution of that question would itself require predictive analysis of each state's laws. This only underscores the complexity of discerning the substantive rules of law that will apply to the enforceability question in the case of each contract.

We do not undertake a full examination of whether and how the laws across all fifty states may differ on the question of whether and when an anti-assignment provision in an SSA can be enforced, or whether states would enforce them in the context of this case. It suffices for present purposes that there is reason to believe that the choice of law issues here are complex, and plaintiffs have not demonstrated how the subclass could be certified without nuanced consideration of

different states' laws.  *See Zinser*, 253 F.3d at 1190 ("The complexity of the trial would be further exacerbated to the extent that the laws of forty-eight states must be consulted to answer such questions.").  With such a significant question about predominance persisting, we hold that the plaintiffs did not carry their Rule 23 burden to "actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23."  *Halliburton Co.*, 573 U.S. at 275.  As the record presently stands, the subclass cannot be certified consistent with Rule 23.

*      *      *

For the foregoing reasons, the district court's class certification decision is

**REVERSED.**